**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

STEVEN BRADFORD,

        Defendant.

No. 05-CR-85-LRR

**SENTENCING MEMORANDUM**

_____

### *TABLE OF CONTENTS*

**I.**    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.**   **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . **2**

    **A.**   *The Case at Bar* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    **B.**   **Bradford II** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

    **C.**   *Sentencing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**III.**  **FACTUAL FINDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    **A.**   *Offense of Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    **B.**   *Relevant Conduct* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        **1.**   *Background facts* . . . . . . . . . . . . . . . . . . . . . **7**
        **2.**   *The heroin deal* . . . . . . . . . . . . . . . . . . . . . **8**
        **3.**   *J.H.'s death* . . . . . . . . . . . . . . . . . . . . . . **10**
        **4.**   *Investigation & identification of Defendant* . . . . . . . . . . . . **11**
        **5.**   *The autopsy: Determining the cause of J.H.'s death* . . . . . . **12**
        **6.**   *Conclusions* . . . . . . . . . . . . . . . . . . . . . . . **14**

**IV.**  **PRELIMINARY ADVISORY SENTENCING GUIDELINES MATTERS** . . **16**

    **A.**   *Base Offense Level* . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

    **B.**   *Acceptance of Responsibility* . . . . . . . . . . . . . . . . . . . . . **16**

    C.    *Other Chapter 2 and Chapter 3 Adjustments* . . . . . . . . . . . . . . . . **20**

    D.    *Tentative Pre-Departure Advisory Guidelines Sentence* . . . . . . . . **20**

V.    **UPWARD DEPARTURE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

    A.    *Threshold Legal Objections* . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
        1.    *An 'end run' around the Plea Agreement?* . . . . . . . . . . . . **21**
        2.    **Apprendi, Booker** *and the Due Process Clause* . . . . . . . . . **24**
            a.    *The* **Rebmann** *cases* . . . . . . . . . . . . . . . . . . . . . . . **24**
            b.    *Why* **Rebmann I** and **II** *are distinguishable* . . . . . . . **27**
        3.    *Burden of proof* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
    B.    *Propriety of a Departure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
        1.    *General principles* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
        2.    *USSG §5K2.21* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
        3.    *USSG §5K2.1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

VI.    **VARIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

    A.    *Downward Variance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**
    B.    *Alternative Sentences* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

VII.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

## I. INTRODUCTION

The matter before the court is the sentencing of Defendant Steven Bradford on his plea of guilty to one count of conspiracy to distribute heroin, in violation of 21 U.S.C. § 846. There are two fighting issues: (1) whether Defendant distributed heroin to a young man, J.H., resulting in J.H.'s death and, if so, (2) whether the court should depart upward.

## II. RELEVANT PRIOR PROCEEDINGS

### A. The Case at Bar

On November 2, 2005, a grand jury charged Defendant in a three-count

Superseding Indictment.[1]  Count 1 charged that, between about 2004 and September of 2005, Defendant knowingly and unlawfully conspired to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 846.[2]  Count 2 charged that, on or about September 19, 2005, Defendant knowingly and intentionally distributed heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  Count 3 charged that, on or about September 22, 2005, Defendant knowingly and intentionally distributed heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

On December 12, 2005, Defendant and the government signed a plea agreement ("Plea Agreement").  Defendant agreed to plead guilty to Count 1 of the Superseding Indictment.  The government agreed to dismiss Count 2 and Count 3, and it promised not to file "additional Title 21 drug-related criminal charges based upon *or arising from* information now in [the government's] possession." (docket no. 30-2, at ¶ 3, italicized words handwritten in original).  On the same date, Defendant appeared before Chief Magistrate Judge John A. Jarvey and pled guilty to Count 1 of the Indictment.  On December 28, 2005, the court accepted Defendant's guilty plea.

### B.  Bradford II

On February 9, 2006, the grand jury charged Defendant in a one-count Indictment in another case, *United States v. Bradford*, No. 06-CR-14-LRR, 433 F. Supp. 2d 1001 (N.D. Iowa 2006) ("*Bradford II*").  Count 1 charged that, on or about June 10, 2004, Defendant knowingly and intentionally distributed heroin to J.H., resulting in the death of J.H. from use of the heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

---

[1]  On September 28, 2005, the grand jury charged Defendant in a two-count Indictment.  It is not relevant here.

[2]  The underlying distribution was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

On April 4, 2006, Defendant filed a Motion for Specific Performance of Plea Agreement and Motion to Dismiss ("Motion for Specific Performance") in *Bradford II*. Defendant claimed that the Plea Agreement forbade the government from pursuing the new Indictment.

On June 2, 2006, the court held that the Indictment in *Bradford II* breached the Plea Agreement in this matter. The court examined the circumstances of the government's investigation of Defendant and ruled that Count 1 of the Indictment in *Bradford II* was a Title 21 drug-related criminal charge "arising from" information in the government's possession on December 12, 2005. The court granted Defendant's Motion for Specific Performance and dismissed the Indictment in *Bradford II*. The government did not appeal the court's ruling.

### C. Sentencing

Meanwhile, on April 26, 2006, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSIR") in the case at bar. The government initially informed the USPO that it did not have any objections to the PSIR. On June 5, 2006, after the court dismissed the Indictment in *Bradford II*, however, the government informed the USPO and Defendant that it intended to seek an upward departure in the instant case. The government announced its intention to seek a departure pursuant to USSG §5K2.1, because the death of J.H. resulted from Defendant's distribution of heroin during the conspiracy. The USPO responded and indicated that an upward departure might be warranted pursuant to USSG §5K2.21, rather than USSG §5K2.1, because the court dismissed the Indictment in *Bradford II*. PSIR at ¶¶ 100-03.

On June 30, 2006, Defendant objected to an upward departure. Defendant denied that he sold heroin to J.H. and denied that J.H. died from heroin use. Defendant also argued that an upward departure would be inequitable, contrary to the advisory Sentencing

Guidelines and unconstitutional.

On July 17, 2006, the USPO submitted a revised PSIR and an Addendum to the court. The USPO noted that the court would need to resolve the propriety of an upward departure. On September 19, 2006, the USPO submitted a Second Addendum to the PSIR.

On September 25 and 26, 2006, the government and Defendant filed their respective sentencing memoranda. On September 28, 2006, the government filed an amended sentencing memorandum.

On October 11, 2006, sentencing proceedings commenced at a hearing ("Hearing"). Assistant United States Attorney Patrick J. Reinert represented the government. Defendant was personally present and represented by Attorney Webb Wassmer.

The propriety of an upward departure was the sole focus of the Hearing. At the conclusion of the evidence and argument, the court adjourned the Hearing and reserved ruling. When the Hearing resumes, the court shall pronounce sentence in a manner consistent with the instant Sentencing Memorandum.

### III. FACTUAL FINDINGS

#### A. Offense of Conviction

In the Plea Agreement, Defendant stipulated to a number of facts. *See* Plea Agreement at ¶ 22. The court finds that the government has proven the following facts beyond a reasonable doubt:

On or about September 19, 2005, a confidential informant told law enforcement officers that the informant had purchased $100 worth of heroin from a person named "Wimp" at 454 Eighth Avenue SW in Cedar Rapids, Iowa, on several occasions in the previous year. *Id.* at ¶ 22(A). On the same day, the confidential informant made a recorded phone call to "Wimp" and arranged to purchase another $100 worth of heroin at the same address. *Id.*

Later that afternoon, the confidential informant met "Wimp" in an apartment at 458 Eighth Avenue SW. *Id.* at ¶ 22(B). While the confidential informant and "Wimp" were inside the apartment, Defendant and Marquita Gates arrived in a Monte Carlo. *Id.* Defendant went into the apartment. *Id.* The confidential informant gave $100 in pre-serialized currency to "Wimp," who in turn purchased three baggies of heroin from Defendant. *Id.* The total amount of heroin in the baggies was less than one gram. *Id.*

On September 22, 2005, the confidential informant called "Wimp" to buy another $100 worth of heroin. *Id.* at ¶ 22(C). The confidential informant met "Wimp" and a person named "Ran" at 458 Eighth Avenue SW. *Id.* The confidential informant gave "Ran" $100 in pre-serialized currency. *Id.* Shortly thereafter, Defendant arrived in the Monte Carlo. *Id.* "Ran" went into the Monte Carlo and gave Defendant the pre-serialized currency in exchange for less than one gram of heroin. *Id.* "Ran" left the Monte Carlo and gave the heroin to the confidential informant. *Id.*

Defendant left the apartment in the Monte Carlo. *Id.* at ¶ 22(D). Law enforcement officers stopped the Monte Carlo and arrested Defendant on an outstanding warrant. *Id.* During a search incident to his arrest, officers recovered the pre-serialized currency from the September 22, 2005 controlled buy. *Id.*

On the same date, law enforcement officers executed a search warrant at 3731 Twelfth Avenue SW, Apartment A-1, in Cedar Rapids, Iowa, which was a residence Defendant and Gates shared. *Id.* at ¶ 22(E). During the search, officers seized a digital scale, baggies, documents and $1,445 in cash, including the $100 in pre-serialized currency from the September 19, 2005 controlled buy. *Id.*

Between about 2004 and September of 2005, Defendant entered into a conspiracy, that is, an explicit or implicit agreement or understanding with one or more persons to distribute heroin. *Id.* at ¶ 22(F). Defendant knowingly entered into the conspiracy, and

he knew the purpose of the agreement or understanding at the time. *Id.* The conspiracy involved the distribution of 100 grams of heroin. *Id.*

The court finds that the foregoing stipulated facts establish a factual basis for Defendant's guilty plea to Count 1 of the Superseding Indictment.

## B. Relevant Conduct

Based on the evidence presented at the Hearing, the court finds the government has proven the following facts by a preponderance of the evidence:

### 1. Background facts

In 2004, the Iowa Division of Narcotics Enforcement ("DNE") participated in an *ad hoc* Drug Task Force. The Drug Task Force was formed after a number of individuals died from heroin overdoses in the Cedar Rapids, Iowa, area. The Drug Task Force's investigation led to Defendant's instant conviction for conspiracy to distribute heroin, in violation of 21 U.S.C. § 846.

DNE Special Agents Jarad Harper and Joshua Lupkes participated in the Drug Task Force's investigation. During the investigation, Special Agent Harper learned that Defendant was a heroin dealer and that his nickname was "B."[3] In June of 2004, there were at least four heroin dealers in the Cedar Rapids area who were using the nickname "B." Special Agent Harper also found out that Defendant preferred to sell heroin to his customers indirectly. Defendant sold heroin through Winfred Lovelady and Leona Ferguson.

There is a relatively small community of heroin users and dealers in the Cedar Rapids area. Many heroin users and dealers in the community know one another.

_____

[3] Special Agent Harper originally thought that Defendant and Larry Wrice were the same person and that they both used the nickname "B." He later learned that they were different people and that Wrice used the nickname "B-Moe."

Generally, trusted sources introduce new customers to dealers. Occasionally, however, new customers "cold call" or introduce themselves to dealers without a referral from a trusted source.

### 2. The heroin deal

In June of 2004, Rachel Hoskins, her boyfriend, James Callanan, and one of her best friends, J.H., were heroin users. Hoskins and Callanan used heroin daily.

On June 10, 2004, Hoskins and Callanan were in Cedar Rapids, Iowa, and J.H. was in Independence, Iowa.[4] At some time during the afternoon or early evening, J.H. called Hoskins and asked her if she could give him a ride to Cedar Rapids. J.H. wanted to go to Cedar Rapids to buy some heroin and a quarter-pound of marijuana. J.H. offered to give Hoskins money for gas if she picked him up in her car, a 2001 Chevy Malibu.

Hoskins and Callanan drove to Independence and picked up J.H. Shortly thereafter, the three left Independence for Cedar Rapids. Hoskins drove the car, Callanan sat in the front passenger-side seat and J.H. sat in the back. They stopped once for gas. J.H. paid for the gas.

---

[4] Independence, Iowa, is approximately thirty-eight miles north-northwest of Cedar Rapids, and it takes about forty-five minutes to an hour to travel between the two cities in a car. These two facts are not in the record, but the court takes judicial notice of them solely for purposes of any appellate review. *See* 29 Am. Jur. 2d *Evidence* § 78 (Supp. 2006) ("Courts often take judicial cognizance of the distances between two . . . locations and the . . . usual time required for travel between them." (Citations omitted.)); *see, e.g., Carroll v. United States*, 267 U.S. 132, 159-60 (1925) (taking judicial notice that Grand Rapids, Michigan, is about 152 miles from Detroit, Michigan); *The Apollon*, 22 U.S. 362, 374 (1824) ("[T]he Court is bound to take notice of public facts and geographical positions."); *Cervantes v. United States*, 263 F.2d 800, 803 n.5 (9th Cir. 1959) ("[W]e take judicial notice of the fact that San Clemente[, California,] is more than seventy miles from the nearest port of entry from Mexico.")

During the drive to Cedar Rapids, Hoskins used a cell phone to call Defendant.[5] Hoskins knew Defendant as a heroin dealer named "B." She had purchased heroin from him numerous times over the years. Defendant refused to talk to Hoskins, however, and hung up on her. Defendant had "cut off" Hoskins and Callanan, because Hoskins had scammed Defendant out of some heroin.

J.H. called Defendant. Defendant agreed to sell heroin to J.H. Defendant and J.H. arranged to meet on the southeast side of Cedar Rapids.[6]

Around 9:30 to 10:00 p.m., Hoskins parked her car on Sixteenth Street SE between Sixth and Seventh Avenues SE. *See* Exhibit 1A (mark "X"). Hoskins parked the car behind a van about one-quarter to one-half of a block from Seventh Avenue SE. *See id.* (mark "O"). She parked it there so that Defendant could not see her or Callanan.

J.H. got out of the car and walked down Sixteenth Street SE towards Seventh Avenue SE. At the corner of Sixteenth Street SE and Seventh Avenue SE, J.H. met Defendant. Sitting in her car, Hoskins was able to recognize Defendant. Although the sun

---

[5] Hoskins' phone number was (319) 334-0248. It was registered to Larry Nabholz. One of Defendant's phone numbers was (319) 521-0581. It was registered to Tiffany Jones. It is common for drug dealers to use phones that are registered in other people's names. During the conspiracy, Defendant used other phone numbers. Phone records from the relevant time period show that calls were made from Hoskins' phone to Defendant's phone. *See* Exhibit 2, *passim*.

[6] This was consistent with Defendant's prior actions. Before Defendant "cut off" Hoskins, Hoskins and Defendant would often arrange to meet in public places on the southeast side of Cedar Rapids. On at least one occasion, however, Hoskins bought heroin from Defendant on the southwest side of Cedar Rapids. Defendant lived on the southwest side.

had set and it was past evening civil twilight,[7] a streetlight on the opposite side of the street lit the corner.

Less than one minute after meeting, J.H. and Defendant walked down Seventh Avenue SE towards Fifteenth Street SE. Defendant had come to the corner from the direction of Seventh Avenue SE. The two men walked out of Hoskins' sight. Defendant sold J.H. heroin.

J.H. later approached from behind and got in Hoskins' car. He had a $50 rock of heroin. In Cedar Rapids, heroin users are usually able to purchase a quarter of a gram of heroin for $40 to $50.

### 3.    *J.H.'s death*

After J.H. bought the rock of heroin from Defendant, Hoskins, J.H. and Callanan went to Callanan's apartment. J.H. and Callanan got high on heroin. Hoskins tried to get

---

[7] The sun set at 8:42 p.m. Exhibit N at 2. Civil twilight ended at 9:16 p.m. *Id.*

> [Civil twilight] begin[s] in the morning, and end[s] in the evening when the center of the sun is geometrically 6 degrees below the horizon. This is the limit at which twilight illumination is sufficient, under good weather conditions, for terrestrial objects to be clearly distinguished; at the beginning of morning civil twilight, or end of evening civil twilight, the horizon is clearly defined and the brightest stars are visible under good atmospheric conditions in the absence of moonlight or other illumination. In the morning before civil twilight and in the evening after the end of civil twilight, artificial illumination is normally required to carry on ordinary outdoor activities. Complete darkness, however, ends sometime prior to the beginning of morning twilight and begins sometime after the end of evening civil twilight.

*Id.* The moon did not rise until 2:19 a.m. on June 11, 2004. *Id.*

high on heroin residue by "rinsing a spoon," but she failed.

J.H. went into a bedroom to use even more heroin. After doing so, his lips turned blue. In a crude attempt to provide medical care, Hoskins gave J.H. mouth-to-mouth resuscitation and sat him up. According to Hoskins, J.H.'s breathing and pulse were then "fine." Throughout the night, Hoskins checked on J.H.

On June 11, 2004, around 5:30 to 6:00 a.m., J.H. started making a gurgling sound. Hoskins called 911 and attempted to provide CPR. Police officers and paramedics arrived and tried to resuscitate J.H., but he died in the apartment.

### 4. *Investigation & identification of Defendant*

Shortly after J.H. died, police officers took Hoskins to the police station. They asked her where J.H. obtained his heroin. Hoskins lied and told them she did not know. Hoskins told the police officers that she had picked up J.H. near a restaurant in Cedar Rapids and, at that time, he had already used heroin. Hoskins lied to the police because she and Callanan were heroin addicts who did not want to lose their source. They also did not want to get in trouble for helping J.H. buy the heroin that killed him.

The police officers pressed Hoskins further, and she changed her story. Hoskins lied again. She told the police officers that she and Callanan had driven J.H. to the southeast side of Cedar Rapids and had parked on Seventeenth Street SE near Sixth or Seventh Avenues SE. She told them that J.H. went into an unknown house and bought heroin from an unknown person. Hoskins repeated these lies to J.H.'s mother.

In December of 2005, approximately a year and a half after J.H.'s death, Iowa Department of Criminal Investigation Special Agent Wade Kisner interviewed Hoskins. Hoskins told Special Agent Kisner that she had dropped off J.H. on Fifteenth Street SE between Fifth and Sixth Avenues SE. She told Special Agent Kisner that "B's" phone number was either (319) 521-0204 or (319) 521-0402.

On January 5, 2006, Special Agent Kisner and another agent interviewed Hoskins about the circumstances surrounding J.H.'s death.  They showed her a photo lineup array of six men and asked if "B" was in the array.  Exhibit 4.  Hoskins positively identified Defendant as the "B" who sold J.H. the heroin.  *Id.*

### 5.    *The autopsy: Determining the cause of J.H.'s death*

Dr. Henry Jackson Carson performed the autopsy on J.H.'s body.  Dr. Carson is an expert pathologist.  A pathologist is a doctor who analyzes specimens taken from the human body.  The specimens range from body fluids, such as blood and urine, to the entire body, the cadaver.

Dr. Carson is a graduate of the University of Iowa College of Medicine, is board-certified in anatomic pathology, clinical pathology and cytopathology, and is licensed to practice medicine in Iowa, Illinois and California.  Dr. Carson is a member of the College of American Pathologists.

During the autopsy, Dr. Carson discovered needle tracks under J.H.'s elbow.  He found chyme and anthracosis in J.H.'s lungs.  Chyme is a product of digestion, and its presence indicates that J.H. aspirated, i.e., he vomited into his lungs.  Anthracosis indicates that J.H. smoked, breathed environmental pollutants or both.

 Dr. Carson took samples of J.H.'s blood and urine and tested them.  The less-sophisticated urine test confirmed the presence of opiates in J.H.'s system.  The more-sophisticated blood test confirmed the presence of a specific opiate, morphine.  Morphine is a by-product of heroin.  Dr. Carson found twenty-three nanograms of heroin per milliliter of blood.[8]

---

[8] Although there is not a therapeutic range established for heroin, the therapeutic range for morphine is ten to seventy nanograms per milliliter of blood.  J.H. was thus

(continued…)

Dr. Carson found mucous plugs and neutrophils in J.H.'s lungs. A neutrophilis is an inflammatory cell associated with either pneumonia or an allergic or inflammatory reaction. From talking with one of J.H.'s relatives, Dr. Carson learned that J.H. suffered from asthma during his life. The presence of the neutrophils and mucous plugs is consistent with an asthma attack.

At the Hearing, Dr. Carson testified that there were five "causes" of J.H.'s death in the medical sense: (1) heroin use; (2) inhibited respiration; (3) reduced judgment and awareness; (4) vomiting; and (5) aspiration. Heroin is a respiratory depressant, it reduces judgment and awareness of one's physiological state, and it causes vomiting. Heroin also suppresses the body's protective gag reflex and coughing that a person normally experiences when choking on vomit. J.H. developed inflammation in his lungs, vomited into his lungs, could not expel the vomitus from his lungs, suffocated and died.

Although J.H. did not "overdose" from heroin in the traditional sense of that term, heroin was the proximate cause of his death. In his autopsy report, Dr. Carson concluded:

> "[O]verdose" in the sense of direct toxicity of the drug is not the immediate cause of death. However, the use of heroin can be designated the proximate cause of death, as he may not have had the asthma attack, and almost certainly would not have died from it, if he had not used the narcotic. Heroin is a respiratory depressant and an emetic, both problematic in a man with a history of asthma. Furthermore, the euphoric effect of the drug can impair one's self-awareness and judg[]ment, thus limiting his ability to detect and respond to changes in his vital functions.

---

[8](...continued)

within the therapeutic range. There was a relatively low level of morphine in J.H.'s blood, because J.H. lived for several hours after he last used heroin and thus his body had time to metabolize some of the heroin. In a typical overdose, death comes quickly, and there is a higher level of the by-products of the drug in the body.

> Whether use of heroin precipitated or exacerbated an asthma
> attack is not clear. In this case, it is appropriate to consider
> both the drug use and the asthma as causes of death.

Exhibit 3. Similarly, at the Hearing, Dr. Carson testified that it is reasonable to a degree of medical certainty that the use of the heroin initiated an asthma attack or an allergic reaction and was the proximate cause of death.

### 6. Conclusions

The court finds that the government has met its burden to prove by a preponderance of the evidence that Defendant sold J.H. heroin and that such heroin resulted in his death. As the foregoing factual findings make clear, the court found the testimony of Hoskins and Dr. Carson at the Hearing to be credible. The court did not find the testimony of Defendant's alibi witness, his mother, Ms. Linda Bradford, to be credible.

On the issue of identity, the court recognizes that Hoskins has made inconsistent statements in the past. However, the court had the opportunity to observe Hoskins at the Hearing and found her credible. She expressed no doubt that Defendant distributed the heroin to J.H.

To the contrary, the court did not find Ms. Bradford credible. Ms. Bradford testified that Defendant spent the first two weeks of June of 2004 with her in Harvey, Illinois, to attend two birthday celebrations. The evidence offered to corroborate Ms. Bradford's claim is unconvincing. Exhibit E, a Cook County, Illinois, probation receipt, is dated June 1, 2004. Exhibits F-1, F-2 and F-3, photographs that purport to show Defendant in Illinois on or about June 10, 2004, are undated. Ms. Bradford did not take the photographs and was not present when they were taken.

On the issue of causation, Dr. Carson's testimony is highly instructive. The heroin Defendant sold J.H. resulted in his death. It was the proximate cause of his death, and,

but for the heroin, J.H. would not have died.

At the Hearing, Defendant attempted to undermine the force of Dr. Carson's medical opinion because, in his autopsy report, he relied upon an article in a medical journal that detailed the death of a heroin addict under different circumstances.[9] Dr. Carson merely cited the article as a reference; he testified that inhaled and injected heroin can have the same ultimate effects on the human body. This is consistent with Special Agent Lupkes's testimony that heroin can be inhaled, injected, smoked or taken orally. Addicts inject heroin because that method of delivery provides the most immediate effect. On a related note, the court finds Defendant's claim that smoking or environmental exposure caused Defendant's death to be wholly speculative. Dr. Carson expressed no doubt that the heroin was the proximate cause of J.H.'s death.

---

[9] *See* Kevin Merigan and Kari Blaho, *The Role of Pharmacology and Forensics in the Death of an Asthmatic, Journal of Analytical Toxicology*, v. 19, p. 522 (October 2005). (Exhibit D-3) (detailing the death of an asthmatic who insufflated heroin, had 80 ng/ml of heroin in his blood and rapidly overdosed). Exhibit D-3.

## IV.  PRELIMINARY ADVISORY SENTENCING GUIDELINES MATTERS[10]

### A.  Base Offense Level

The parties agree that the applicable sentencing guideline for Defendant's violation of 21 U.S.C. § 846 is USSG §2D1.1.  Plea Agreement at ¶ 8(A); *see* USSG App. A.  The parties stipulate that, based on Defendant's involvement in a conspiracy involving 100 grams of heroin, the appropriate base offense level is **26**.  *Id.* at ¶ 8(A); *see* USSG §2D1.1(a)(3) and (c)(7).  The court agrees with the parties' stipulation.

### B.  Acceptance of Responsibility

In the Plea Agreement, the parties stipulated that Defendant "appears to qualify for a two-level downward adjustment for acceptance of responsibility" pursuant to USSG §3E1.1(a).  Plea Agreement at ¶ 8(B).  If the court grants Defendant the two-level downward adjustment, the government agreed to move the court to grant Defendant a one-level downward adjustment pursuant to USSG §3E1.1(b).  *Id.*  However, Defendant stated

---

[10]    Although application of the Sentencing Guidelines is no longer mandatory, [in the Eighth Circuit] district courts are still required to consult the Guidelines and take them into account in calculating a defendant's sentence. A district court must calculate a defendant's advisory Guidelines sentencing range based on his total offense level, criminal history category, and any appropriate departures. The court may also vary from the advisory Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a) as long as the resulting sentence is reasonable. Proper application of the Guidelines "remains the critical starting point" for fashioning a reasonable sentence under § 3553(a), and a sentence within the properly calculated Guidelines range is presumed to be reasonable.

*United States v. Jeremiah*, 446 F.3d 805, 807 (8th Cir. 2006) (citing, in part, *United States v. Booker*, 543 U.S. 220, 264 (2005)).

that he understood "that the court **is not** bound by the stipulation of the parties . . . . , [and the Plea Agreement] provides for no guarantee concerning the actual sentence to be imposed." *Id.* at ¶ 8(D) (emphasis in original).

At the beginning of the Hearing, the court conditionally granted a downward adjustment for acceptance of responsibility pursuant to USSG §3E1.1. The court reserved final ruling on the issue until presentation of the evidence on the departure issue concluded and Defendant was afforded his right of allocution. The court now turns to consider whether Defendant has accepted responsibility.

In its entirety, §3E1.1 provides:

### §3E1.1. Acceptance of Responsibility

**(a)** If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

**(b)** If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level **16** or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by **1** additional level.

USSG §3E1.1 (emphasis in original). Defendant bears the burden to prove, by a preponderance of the evidence, that he has accepted responsibility. *Peters v. United States*, 464 F.3d 811, 812 (8th Cir. 2006) (stating that the burden is on the defendant); *cf. United States v. Postel*, No. 05-CR-103-LRR, 2006 WL 2513022, at *3 (N.D. Iowa Aug. 29, 2006) (Reade, J.) (applying preponderance of the evidence standard) (citations

omitted).

In determining whether Defendant has met his burden to show that he qualifies for a reduction for acceptance of responsibility, appropriate considerations include but are not limited to:

> (a) truthfully admitting the conduct comprising the offense[] of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) . . . .;
> (b) voluntary termination or withdrawal from criminal conduct or associations;
> (c) voluntary payment of restitution prior to adjudication of guilt;
> (d) voluntary surrender to authorities promptly after commission of the offense;
> (e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;
> (f) voluntary resignation from the office or position held during the commission of the offense;
> (g) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and
> (h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

USSG §3E1.1 cmt. (n.1). "[A] defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction . . . ." *Id.* "A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection." *Id.* "However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." *Id.*; *see also United States v. Bell*, 411 F.3d 960, 963 (8th Cir.) (recognizing same principle), *cert. denied*, 126 S. Ct. 471 (2005).

Considering all of the circumstances and appropriate factors, the court finds that Defendant has not accepted responsibility. As the court's factual findings in Part III(B) make clear, the court finds that Defendant sold heroin to J.H. on June 10, 2004. Defendant's drug distribution is relevant conduct to the offense of conviction, because the distribution to J.H. occurred during the charged conspiracy. *See* USSG §1B1.3(a)(1) (stating that relevant conduct includes "all acts . . . committed . . . by the defendant . . . that occurred during the commission of the offense of conviction . . . ."). Defendant has repeatedly denied that he sold heroin to J.H., *see, e.g.*, Addendum to PSIR at 3-4 ("[D]efendant states that he did not have any involvement in the distribution of heroin that resulted in the death of [J.H.]"), and therefore he has repeatedly denied relevant conduct. The court finds Defendant has not met his burden to show that he has accepted responsibility. *See, e.g., United States v. Annis*, 446 F.3d 852, 857-58 (8th Cir. 2006) (affirming district court's decision to deny defendant an acceptance of responsibility reduction, because defendant denied relevant conduct); *United States v. Greger*, 339 F.3d 666, 672-73 (8th Cir. 2003) (same); *United States v. Honken*, 184 F.3d 961, 972-73 (8th Cir. 1999) (same).[11]

---

[11] Even if Defendant's repeated denial of relevant conduct were insufficient to deny him a reduction for acceptance of responsibility, the court would nonetheless decline to grant him such a reduction. The court was deeply troubled that Defendant called his mother to testify as an alibi witness. Ms. Bradford's testimony was not credible. It was patently false. The court believes Ms. Bradford perjured herself and that Defendant knowingly presented the court with a false alibi. This also indicates a lack of acceptance of responsibility. *Cf. United States v. Jagim*, 978 F.2d 1032, 1038 (8th Cir. 1992) (holding defendant was not entitled to acceptance of responsibility in part because he suborned perjury); *United States v. Lato*, 934 F.2d 1080, 1083 (9th Cir. 1991) (holding defendant was not entitled to acceptance of responsibility, despite his plea of guilty, where he attempted to suborn perjury).

### C.  Other Chapter 2 and Chapter 3 Adjustments

In the Plea Agreement, the parties stipulate and agree that there are no other applicable upward or downward adjustments to Defendant's offense level under Chapter 2 or Chapter 3 of the advisory Sentencing Guidelines.  Plea Agreement at ¶ 8(C).  The court agrees and finds that no such adjustments are warranted.

### D.  Tentative Pre-Departure Advisory Guidelines Sentence

Defendant is a **Criminal History Category III**.  PSIR at ¶ 55.  **At an offense level of 26, the advisory Sentencing Guidelines range, if the court does not depart upward pursuant to Chapter 5, is 78 to 97 months' imprisonment.**  *See* USSG Sentencing Table.  The statutory minimum sentence is 5 years' imprisonment and the statutory maximum sentence is 40 years' imprisonment.  21 U.S.C. § 846 (stating that a person convicted of conspiracy "shall be subject to the same penalties as those prescribed for the [underlying substantive] offense"); *see also* 21 U.S.C. § 841(b)(1)(B) (stating that "such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years").

## V.  UPWARD DEPARTURE

The government seeks an upward departure to 240 months' imprisonment pursuant to USSG §5K2.21 (Dismissed and Uncharged Conduct) and USSG §5K2.1 (Death).  Before the court analyzes these provisions, it shall consider three threshold legal challenges that Defendant lodges against the propriety of an upward departure.  Specifically, the court shall address Defendant's claims that (1) the government's motion for an upward departure is "an impermissible 'end run' around" the court's order to dismiss the Indictment in *Bradford II*; (2) *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *United States v. Booker*, 543 U.S. 220 (2005), and the Due Process Clause prohibit any increase in punishment for J.H.'s death; and, alternatively, (3) *Apprendi* and *Booker* require that the government

prove all factual matters beyond a reasonable doubt.  The court considers each argument, in turn.

## A.   *Threshold Legal Objections*

### 1.   *An 'end run' around the Plea Agreement?*

Defendant contends that the government's request for an upward departure is an impermissible 'end run' around the court's dismissal of *Bradford II*.  Defendant points out that the factual grounds for the Indictment in *Bradford II* and a departure in the case at bar are the same: namely, Defendant's distribution of heroin to J.H. and J.H.'s resulting death.  Defendant stresses that, if he had not exercised his right under the Plea Agreement to seek dismissal of the Indictment in *Bradford II*, he could not have received additional time in prison for J.H.'s death unless a jury found him guilty beyond a reasonable doubt. Defendant contends that an upward departure in this case would render the Plea Agreement "meaningless" and deprive him of the benefit of his bargain with the government.  He also claims that it is a violation of due process, because he is, in effect, being penalized for exercising his rights under the Plea Agreement.

The Plea Agreement is a contract between Defendant and the government.  *United States v. Fowler*, 445 F.3d 1035, 1037 (8th Cir. 2006) (citing, in part, *United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003)).  Ordinary contract principles apply.  *United States v. DeWitt*, 366 F.3d 667, 669 (8th Cir. 2004) (citing *Margalli-Olvera v. INS*, 43 F.3d 345, 351 (8th Cir. 1994)).  To interpret the Plea Agreement, "the court must apply the federal common law of contracts, which is informed by federal cases, state cases and the Restatement (Second) of Contracts, insofar as such jurisprudence fairly typifies the general law of contracts."  *Bradford II*, 433 F. Supp. 2d at 1003 (citing *United States v. Andreas*, 216 F.3d 645, 663 & 663 n.5 (7th Cir. 2000)).  "A plea agreement involves matters of constitutional significance, however, and the failure of the government to abide

by the promises made therein violates a defendant's due process rights." *Fowler*, 445 F.3d at 1037 (citing, in part, *United States v. Van Thournout*, 100 F.3d 590, 594 (8th Cir. 1996)).

A cardinal principle of contract law is that, when the terms of a contract are clear and unambiguous, they should be given their ordinary meaning. *See, e.g., Modern Equip. Co. v. Cont'l W. Ins. Co.*, 355 F.3d 1125, 1128 (8th Cir. 2004) (applying Iowa law) (citing *McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 842 F. Supp. 1166, 1170 (N.D. Iowa 1993) (Melloy, J.), *aff'd*, 48 F.3d 1223 (8th Cir. 1995)); *accord* Restatement (Second) of Contracts § 202(3)(a) (1981) ("Unless a different intention is manifested, . . . where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). It is not the province of the court to rewrite a contract to provide terms that the court might consider more equitable to one of the parties. *See, e.g., Jurrens v. Hartford Life Ins. Co.*, 190 F.3d 919, 924 (8th Cir. 1999) (applying South Dakota law) (citing *Cornellier v. Am. Cas. Co.*, 389 F.2d 641, 644 (2d Cir. 1968)).

The Plea Agreement makes clear that the government cannot file additional Title 21 charges arising from information that it had in its possession on December 12, 2005. Plea Agreement at ¶ 3; *see Bradford II*, 433 F. Supp. 2d at 1007. The Plea Agreement sets Defendant's base offense level at 26, indicates that Defendant appears to qualify for a three-level reduction for acceptance of responsibility and states that "[t]here are no other applicable upward or downward adjustments to [D]efendant's offense level under Chapters 2 and 3." Plea Agreement at ¶ 8. Notably, the Plea Agreement is silent regarding Chapter 5 departures. *Id.*, *passim*. Because the Plea Agreement is the "entire agreement between the parties," *Id.* at ¶ 26, the court finds that the parties are free to litigate all departure issues at sentencing.

The ability of the government to seek an upward departure does not render the Plea

Agreement "meaningless." The Plea Agreement affords Defendant a substantial benefit, even without a promise by the government not to move for an upward departure. In signing the Plea Agreement, Defendant limited his exposure to additional Title 21 charges. Among other things, this may prove beneficial to Defendant at some future sentencing should he recidivate. Defendant avoided a twenty-year mandatory minimum sentence of imprisonment for J.H.'s death. *See* 21 U.S.C. § 841(b)(1)(C) (stating that if death results from distribution of heroin, the defendant "shall be sentenced to a term of imprisonment of not less than 20 years or more than life"); *cf. United States v. Lilly*, 56 F. Supp. 2d 856, 858 n.2 (W.D. Mich. 1999) (noting, under similar circumstances, that the defendant benefitted because he avoided a statutory minimum sentence). Defendant avoided a mandatory base offense level classification of 38, prior to adjustments, under USSG §2D1.1(a)(2); *cf. Lilly*, 56 F. Supp. 2d at 858 n.2 (noting, under similar circumstances, that the defendant benefitted by avoiding a base offense level of 38).

The government's motion for an upward departure is not a violation of due process, because the Plea Agreement left the parties free to litigate departures. The court cannot now rewrite the Plea Agreement to afford Defendant a better bargain than the parties reached in their arms-length negotiations. *See, e.g., Jurrens*, 190 F.3d at 924 (applying South Dakota law) (citing *Cornellier*, 389 F.2d at 644). Defendant knowingly, voluntarily and intelligently waived his right to a jury trial on Count 1 and remains liable for an upward departure to the statutory maximum of 40 years' imprisonment for such offense. Plea Agreement at ¶ 1 (stating that the statutory maximum sentence is 40 years' imprisonment).

In sum, the court holds that the government's request for an upward departure is not an impermissible 'end run' around the court's dismissal of the Indictment in *Bradford II*.

### 2.    **Apprendi,** Booker *and the Due Process Clause*

Defendant asserts that *Apprendi*, *Booker* and the Due Process Clause prohibit any increase in punishment for J.H.'s death. Defendant does not directly discuss the *Booker* line of cases, but instead relies on *United States v. Rebmann*, 321 F.3d 540 (6th Cir. 2003) ("*Rebmann II*"), for his conclusion that due process forbids the government's motion for an upward departure.[12] Because *Rebmann II* is the only case Defendant analyzes, the court discusses it at length.

#### a.    *The* Rebmann *cases*

Defendant contends that *Rebmann II* is indistinguishable from the case at bar. The essence of *Rebmann II,* he avers, is that an element of a crime, such as the substantially increased penalties of the "death results" provision in 21 U.S.C. § 841(b)(1)(C), may not be used as a sentencing factor to greatly increase a sentence without the full protections of due process. Defendant contends he is entitled to have a jury decide, beyond a reasonable doubt, whether he sold heroin to J.H. and, if so, whether such distribution resulted in J.H.'s death.

*Rebmann II* is the second of two decisions of the Sixth Circuit Court of Appeals in a procedurally unique and complex criminal case. In the district court, the defendant pled guilty to the distribution of .036 grams of heroin, in violation of 21 U.S.C. § 841(a)(1), pursuant to a plea agreement. *United States v. Rebmann*, 226 F.3d 521, 522 (6th Cir. 2000) ("*Rebmann I*"), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377, 385 n.9 (6th Cir. 2002); *see also Rebmann II*, 321 F.3d at 541 (revealing drug quantity). Although the maximum statutory term of imprisonment for the distribution was 20 years' imprisonment, the parties agreed in the plea agreement that, "if the district court

---

[12] The court notes that *Rebmann II* is not controlling authority.

found that death resulted from the distribution, [the defendant] would be sentenced to a term of 20 years to life." *Id.*[13] The district court found by a preponderance of the evidence that the defendant's husband died as a result of the distribution charged in the indictment and sentenced her to 292 months' imprisonment. *Id.* Absent this finding, the defendant's advisory Sentencing Guidelines range would have been 24 to 30 months' imprisonment. *Id.*

In *Rebmann I*, the defendant argued that the district court should have applied a beyond-a-reasonable-doubt standard, not a preponderance-of-the-evidence standard. *Id.* Quoting *Apprendi*, the Sixth Circuit Court of Appeals held that

> "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Id.* at 524 (quoting *Apprendi*, 530 U.S. at 476). The Sixth Circuit Court of Appeals found that 21 U.S.C. § 841 "provides for a factual determination of whether the distribution of drugs caused death . . . and that the factual determination significantly impacts the sentence imposed by the court, increasing the maximum penalty from 20 years to that of life imprisonment." *Id.* The Sixth Circuit Court of Appeals found that the defendant waived her right to a jury trial on the issue of death in her plea agreement, but reserved her "right to have a court decide any remaining elements of the offense beyond a reasonable doubt." *Id.* "Because the factual provisions at issue are factual determinations

---

[13] Section 841(b)(1)(C), to which the defendant (and Defendant) did not plead guilty, provides that a defendant "shall be sentenced to a term of imprisonment of not less than twenty years or more than life" if death results from the use of the distributed controlled substance.

and because they increase the maximum penalty to which [the defendant] was exposed, [the Sixth Circuit Court of Appeals found] that they are elements of the offense which must be proven beyond a reasonable doubt." *Id.* at 524-25. In concluding, the Sixth Circuit Court of Appeals wrote:

> [I]t would indeed require a casual approach to the trial rights afforded defendants under our Constitution if this court were to allow a trial court to determine that a defendant who pled guilty merely to the physical distribution of a drug (with a corresponding sentence of less than 20 years) is subject to a sentence of up to life imprisonment because the court believed, only by a preponderance of the evidence, that death resulted from that crime regardless of the defendant's intent to harm. The exercise of such extensive power by the trial court in its role as sentencer rather than as factfinder illustrates quite clearly the erosion of the jury trial and the right to have elements of an offense decided beyond a reasonable doubt that the [Supreme] Court so explicitly sought to protect . . . .

*Id.* at 525. The Sixth Circuit Court of Appeals remanded for factual finding on whether the defendant's distribution caused death using a beyond-a-reasonable-doubt standard. *Id.*

On remand, the government withdrew its request for a "death enhancement" based on § 841(b)(1)(C). *Rebmann II*, 321 F.3d at 541. Instead, the government argued that the district court should apply USSG §2D1.1(a)(2) and sentence the defendant to the maximum allowable sentence of 20 years' imprisonment under 21 U.S.C. § 841(a). *Id.* The government again sought a determination by a preponderance of the evidence. *Id.* at 541-42. The district court held that the government's argument was contrary to the specific mandate of the Sixth Circuit Court of Appeals to apply a beyond-a-reasonable-doubt standard, found that the government had not proven death beyond a reasonable doubt and sentenced the defendant to 30 months' imprisonment. *Id.* at 542.

In *Rebmann II*, the Sixth Circuit Court of Appeals affirmed. The Sixth Circuit

Court of Appeals pointed out that USSG §2D1.1(a)(2) provides for an increased base offense level of 38 "if the defendant is convicted under [21 U.S.C. § 841(b)(1)(C)] and *the offense of conviction* establishes that death or serious bodily injury resulted from the use of the substance." *Id.* at 544 (emphasis added) (citing §2D1.1(a)(2)). The Sixth Circuit Court of Appeals defined "offense of conviction" as "describ[ing] only the precise conduct for which the defendant was convicted, and . . . not . . . non-offense relevant conduct." *Id.* at 543-44 (citing, in part, USSG §1B1.2(a)). Neither the charge nor the stipulated facts underlying the charge established that death resulted from the use of heroin. *Id.* at 544. Thus, the Sixth Circuit Court of Appeals held that §2D1.1(a)(2) was not applicable. *Id.*

In dicta, the Sixth Circuit Court of Appeals expressed concern that increasing a sentence seven-fold—from 30 months' imprisonment to 240 months' imprisonment—might raise a due process problem. Quoting *McMillian v. Pennslyvania*, 477 U.S. 79, 88 (1986), the Sixth Circuit Court of Appeals warned that a sentencing enhancement should not become "'the tail which wags the dog of the substantive offense.'" *Rebmann II*, 321 F.3d at 544. If it were to hold otherwise, the defendant might be sentenced "for a homicide under the guise of a guilty plea to the distribution of a very small quantity of drugs." *Id.* at 545.

### b. *Why* Rebmann I and II *are distinguishable*

The court holds that the *Rebmann* cases are distinguishable. *Rebmann I* is distinguishable because, in the case at bar, the government does not seek to increase Defendant's sentence beyond the statutory maximum. The statutory maximum is 40 years' imprisonment, and the government seeks a lesser sentence of 20 years' imprisonment. Therefore, the government's motion for an upward departure does not run afoul of the *Apprendi* principle that "'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior

conviction) *that increases the maximum penalty for a crime* must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" *Apprendi*, 530 U.S. at 476 (emphasis added); *cf. Lilly*, 56 F. Supp. 2d at 859 n.3 (anticipating *Apprendi* and holding, under similar circumstances, that the court could "properly consider the death of [the victim] so long as Defendant's sentence does not exceed the statutory maximum of 40 years").

*Rebmann II* is distinguishable because, in the case at bar, the government seeks a departure pursuant to §5K2.21 and §5K2.1, not an increase in Defendant's base offense level pursuant to §2D1.1(a)(2). Consistent with the teachings of *Rebmann II*, the government has not sought such an increase, because the offense of conviction, conspiracy to distribute heroin, does not include the death of J.H. Death is not mentioned in Count 1 of the Superseding Indictment.

The Eighth Circuit Court of Appeals has made clear that upward departures are appropriate for conduct falling outside the "offense of conviction." The conduct must only "'relate in some way to the offense of conviction.'" *United States v. Rogers*, 423 F.3d 823, 828 (8th Cir. 2005) (quoting *United States v. Kim*, 896 F.2d 678, 684 (2d. Cir. 1990)). "The court is not limited to considering 'relevant conduct' as defined in USSG §1B1.3." *Id.* The court may consider "'any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.'" *Id.* (quoting USSG §1B1.4). The Eighth Circuit Court of Appeals has explicitly recognized that "the range of information includes dismissed or uncharged criminal conduct." *Id.* (citing USSG §5K2.21); *cf. United States v. Neal*, 249 F.3d 1251, 1260 (11th Cir. 2001) ("[U]pward departures are allowed for acts of misconduct not resulting in conviction, as long as those acts, whether or not relevant conduct in the [§]1B1.3 sense, relate meaningfully to the offense of conviction." (Citation and internal quotation marks omitted.)).

In this case, the requisite nexus between the count of conviction and the dismissed conduct clearly exists. Defendant distributed heroin to J.H. during the charged conspiracy to distribute heroin. The distribution to J.H. thus "'relate[s] in some way to the offense of conviction.'" *Rogers*, 423 F.3d at 828 (quoting *Kim*, 896 F.2d at 684).

The dicta in *Rebmann II*—the admonition that a sentencing enhancement should not become "'the tail which wags the dog of the substantive offense'"—is also distinguishable. *Rebmann II*, 321 F.3d at 544 (quoting *McMillian*, 477 U.S. at 88). Since the Supreme Court decided *McMillian*, it has made clear that a due process violation only occurs when the court makes a factual finding by a preponderance of the evidence to "authorize a sentence in excess of that otherwise allowed for the underlying offense." *Blakely v. Washington*, 542 U.S. 296, 304 (2004) (discussing *McMillian*). As indicated, the government is not seeking to use the departure to increase Defendant's sentence beyond the statutory maximum of 40 years' imprisonment. *Cf. United States v. Mix*, 457 F.3d 906, 914 (9th Cir. 2006) (holding that the district court did not violate the defendant's right to due process when it departed upward to life imprisonment pursuant to §5K2.21, because his sentence was within the maximum set forth in the United States Code for the offense of conviction).[14] The Eighth Circuit Court of Appeals has repeatedly rejected the argument that the use of uncharged or dismissed criminal conduct to enhance a sentence is unconsitutional. *See, e.g., United States v. Leaf*, 306 F.3d 529, 533-34 (8th Cir. 2002) (citing *United States v. Galloway*, 976 F.2d 414, 422-27 (8th Cir. 1992) (en banc)).

---

[14] The court also notes that the proposed departure would result in a sentence three to four times higher than Defendant's advisory Sentencing Guidelines range; such a sentence enhancement is approximately half the degree of the seven times higher sentence which the government sought in *Rebmann II*. Moreover, Defendant is charged with a much higher drug quantity, 100 grams of heroin, versus the .036 gram of heroin at issue in *Rebmann II*.

In sum, the court holds that *Apprendi*, *Booker* and the Due Process Clause do not prohibit an upward departure for J.H.'s death.

### 3. Burden of proof

Lastly, Defendant argues that *Apprendi* and *Booker* require the government to prove all factual matters on the issue of a departure beyond a reasonable doubt. Defendant again relies on the *Rebmann* cases, which the court has already distinguished. The Eighth Circuit Court of Appeals has held that "judicial fact-finding using a preponderance of the evidence standard is permitted provided that the guidelines are applied in an advisory manner." *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) (citing *United States v. Wade*, 435 F.3d 829, 831 (8th Cir. 2006)); *see, e.g., Ademi*, 439 F.3d at 966 (8th Cir. 2006) (affirming use of preponderance-of-the-evidence standard for factual findings underlying §5K2.0 and §5K2.21 upward departures).

In sum, the court holds that a preponderance-of-the-evidence standard, not a beyond-a-reasonable-doubt standard, is appropriate.

## B. Propriety of a Departure

As indicated, the government seeks an upward departure pursuant to USSG §5K2.21 (Dismissed and Uncharged Conduct) and USSG §5K2.1 (Death). After setting forth the general law of departures, the court examines each provision, in turn.[15]

### 1. General principles

In discussing the propriety of departures generally, the Eighth Circuit Court of Appeals recently summarized:

> Departures are appropriate if the sentencing court finds that

_____

[15] Typically, the court considers guidelines in order. *See* USSG §1B1.1 (discussing order of application). Here, however, the court will consider USSG §5K2.21 first. *See id.* §1B1.1(i) (directing application of departures but not in any specific order).

there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, cmt. n. 4(b).

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered).

The decision whether to depart from the advisory Sentencing Guidelines rests within the sound discretion of the district court. *See, e.g., United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing judge" (citations and internal quotation marks omitted)). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases . . . ." *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002) (citing *Koon*, 518 U.S. at 95)).

"The district court is not left adrift . . . in determining which cases fall within and which cases fall outside of the 'heartland.'" *McCart*, 377 F.3d at 877 (citing *Koon*, 518 U.S. at 94). In USSG §5K2.1 *et seq.*, "[t]he Sentencing Commission enumerated some of the factors that it believed are not adequately accounted for in the formulation of the Guidelines and might merit consideration as aggravating or mitigating circumstances."

*Thin Elk*, 321 F.3d at 708 (citing USSG §5K2.0). The enumerated factors that might merit consideration as aggravating circumstances are so-called "encouraged" factors. *See, e.g., McCart*, 377 F.3d at 877 (discussing "encouraged" and "discouraged" factors). "'If the [enumerated] factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account.'" *Id.* (quoting *Koon*, 518 U.S. at 96). Dismissed and uncharged conduct, USSG §5K2.21, and death, USSG §5K2.1, are two "encouraged" factors.

The court finds that this case falls outside the "heartland." The court considers USSG §5K2.21 and USSG §5K2.1, in turn.

### 2. USSG §5K2.21

In full, USSG §5K2.21 states:

> ### § 5K2.21. Dismissed and Uncharged Conduct (Policy Statement)
>
> The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

USSG §5K2.21 (emphasis in original). By its terms, USSG §5K2.21 makes clear that the court "cannot enhance a sentence based on a factor already counted in the original sentence." *United States v. Mack*, 452 F.3d 744, 746 (8th Cir. 2006).

Section 5K2.21 applies in the case at bar. First, Defendant's distribution of heroin resulting in the death of J.H. is conduct underlying Count I of the Indictment in *Bradford II*, a potential charge dismissed as part of a plea agreement in the case. Second, such conduct did not enter into the determination of the applicable guideline range. Arguably,

§2D1.1 takes into account some of the pernicious effects of unlawful substances, because it is directed at the unlawful manufacturing, importing, exporting and trafficking of controlled substances. *See* USSG §2D1.1, *passim*. Defendant's distribution of heroin resulting in the death of J.H., however, clearly did not enter into the determination of the applicable range. As the court made clear in its discussion of *Rebmann II*, *see supra* Parts V(A)(2)(a) and (b), USSG §2D1.1 contains a specific provision for death: USSG §2D1.1(a)(2). This provision was inapplicable in the case at bar, because death was not part of the "offense of conviction." *See supra* Parts V(A)(2)(a) and (b); *see also* USSG §1B1.2(a) (defining offense of conviction as "the offense conduct charged in the count of the indictment . . . of which the defendant was convicted"); *United States v. Pressler*, 256 F.3d 144, 157 n.7 (3d Cir. 2001) (examining §2D1.1 and opining in dicta that "several factors lead us to believe that the phrase includes only the facts underlying the specific criminal offense for which the defendant was convicted" and that "not *all* acts or omissions committed or willfully caused by a defendant *during* the commission of the offense of conviction are themselves *part* of the offense of conviction" (emphasis in original)). *Compare Rebmann II*, 321 F.3d at 544 (holding §2D1.1(a)(2) was inapplicable because death was not part of the offense of conviction), *with United States v. Shah*, 453 F.3d 520, 524 (D.C. Cir. 2006) (holding that §2D1.1(a)(2) applied because defendant pled guilty to a crime that contemplated "death or serious bodily injury from the use of" heroin). "Under [§]2D1.1, the base offense level for a defendant whose [offense of conviction] does not involve death or serious bodily injury resulting from the use of a controlled substance is determined exclusively by the drug quantity table." *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003) (citing §2D1.1(a)(3)).

In his sentencing memorandum, Defendant contends that, "[s]ince §2D1.1 expressly limits consideration of death results to cases where the death has been established as part

of the offense of conviction," J.H.'s death cannot be considered "in any way in sentencing Defendant." Defendant's premise is true but his conclusion is false. The government does not contend that Defendant's base offense level is 38 pursuant to §2D1.1(a)(2). *Cf.* PSIR at ¶ 102 ("[T]he probation office believes that the base offense level pursuant to USSG §2D1.1(a)(2) does not apply because the *offense of conviction* does not establish that death or serious bodily injury resulted from the use of the substance." (Emphasis in original.)). The issue is not whether death may be taken into account in calculating the base offense level under §2D1.1, but whether death may be considered in an upward departure pursuant to §5K2.21. Nothing in the Sentencing Guidelines forbids such a departure. Indeed, §5K2.21 expressly contemplates that a court "may depart upward to reflect the actual seriousness of the offense" for conduct that "did not enter into the determination of the applicable guideline range." USSG §5K2.21. The court finds that a departure is necessary in this case for precisely this reason.

The question, then, is not *whether* the court may depart upward under §5K2.21, but to what *extent* it should depart upward. The government requests a departure up to 20 years' imprisonment. Defendant does not specifically challenge the extent of the government's requested departure.

The court can find no cases precisely on point. Cases in the Eighth Circuit interpreting §5K2.21 are relatively few.[16] The Eighth Circuit Court of Appeals' most

---

[16] Section 5K2.21 became effective on November 1, 2000. The amendment resolved a conflict in the circuit courts of appeal as to whether §5K2.0 permitted consideration of dismissed or uncharged conduct. *United States v. Bolden*, 368 F.3d 1032, 1035 (8th Cir. 2004). Before §5K2.21 became effective, the Eighth Circuit Court of Appeals held that such consideration was forbidden if it was "in clear opposition to the intentions of the parties as embodied in their plea agreement." *United States v. Harris*, 70 F.3d 1001, 1003 (8th Cir. 1995).

recent case, however, is instructive.

In *United States v. Mack*, 452 F.3d 744 (8th Cir. 2006), the defendant pled guilty to one count of sexual abuse of a minor, in violation of 18 U.S.C. § 2243. *Mack*, 452 F.3d at 745. As part of a plea agreement, the government dismissed a possession of child pornography count, in violation of 18 U.S.C. § 2252A(a)(5)(A). *Id.* The defendant had sex with the minor and made a videotape of some of the sex. *Id.*

The defendant's advisory Sentencing Guidelines range on the count of conviction was 30 to 37 months' imprisonment. *Id.* The court departed upward to 51 months' imprisonment under §5K2.21 because of the dismissed possession of child pornography count. *Id.* In arriving at the 51 months' imprisonment figure, the district court calculated the defendant's hypothetical advisory Sentencing Guidelines for the dismissed possession of child pornography count. *Id.* The court determined that the defendant's hypothetical advisory Sentencing Guidelines range would have been 51 to 63 months' imprisonment,[17] and sentenced the defendant at the bottom of this hypothetical range. *Id.* The Eighth Circuit Court of Appeals held that this was a permissible analysis for determining the extent of an upward departure pursuant to §5K2.21. *Id.* at 745-47. The Eighth Circuit Court of Appeals also held that, on the facts of the case, the resulting sentence was reasonable. *Id.* at 547. It affirmed the sentence. *Id.*

---

[17] The district court in *Mack* disregarded a cross-reference that would have "enhanc[ed] [the defendant's] sentence more than either [the defendant] or the government anticipated." *Mack*, 452 F.3d at 745. In the case at bar, the court disregards the fact that the advisory Sentencing Guidelines range for Defendant's hypothetical sentence would have been subject to a twenty-year mandatory minimum, because the parties did not anticipate that such minimum would have any role in the calculation of Defendant's sentence.

The court finds that a similar analysis is appropriate here.[18] Hypothetically, if Defendant had been convicted of distribution of heroin resulting in death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), he would have had a base offense level of 38. USSG §2D1.1(a)(2). Because Defendant is a Criminal History Category III, PSIR at ¶ 55, his advisory Sentencing Guidelines range would have been 292 to 365 months' imprisonment.

The court finds that an upward departure of twelve levels to a range of 292 months' to 365 months' imprisonment is appropriate in calculating Defendant's advisory Sentencing Guidelines range. This departure is warranted because Defendant distributed heroin to J.H., and such distribution resulted in the death of J.H. The death of J.H. was not taken into consideration in calculating Defendant's pre-departure advisory Sentencing Guidelines range. *See supra* Part IV.

The court recognizes that the extent of the upward departure in this case, although calculated using the same analysis approved of in *Mack*, is much greater than that approved of in *Mack*. The discrepancy is purely a function of the greater emphasis the Sentencing Commission places on death than on possession of child pornography. The extent and degree of the court's upward departure reflects the actual seriousness of the conduct underlying the dismissed count in this case, as determined by the Sentencing Commission. Although the upward departure is greater in degree than many this court has previously imposed, it is certainly not unprecedented. *See, e.g., United States v. Lewis,* 235 F.3d

----

[18] The court does not suggest that the *Mack* analysis is the only analysis appropriate for determining the extent of a §5K2.21 departure. The Eighth Circuit Court of Appeals did not so hold in *Mack*. The court acknowledges that, in some cases, a hypothetical advisory Sentencing Guidelines sentence will not be available or may be inappropriate. The benefit of the *Mack* analysis, of course, is that it provides district courts with a reasoned basis for a specific extent of departure that is consistent with the express policy findings of the Sentencing Commission.

394, 396-97 (8th Cir. 2000) (affirming an "exceptional" upward departure of fourteen levels that resulted in an increase in the defendant's sentencing range from 18 to 24 months' imprisonment to 87 to 108 months' imprisonment); *see also United States v. Reis*, 369 F.3d 143, 152 (2d Cir. 2004) ("[The Second Circuit Court of Appeals] has often affirmed upward departures that more than triple the upper-limit of the sentencing range." (Citations omitted.)).

### *b.  USSG §5K2.1*

The government also seeks an upward departure pursuant to USSG §5K2.1.  Section 5K2.1 provides:

> ### § 5K2.1. Death (Policy Statement)
>
> If death resulted, the court may increase the sentence above the authorized guideline range.
>
> Loss of life does not automatically suggest a sentence at or near the statutory maximum.  The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation.  Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken.  The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury.  For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

USSG §5K2.1 (emphasis in original).  By its terms, when death results, USSG §5K2.1

"authorize[s] courts to 'increase the sentence above the authorized guideline range' up to the statutory maximum for the offense of conviction." *United States v. Howard*, 454 F.3d 700, 703 (7th Cir. 2006) (quoting USSG §5K2.1).[19] Every circuit court of appeals that has considered the issue has held that an upward departure under §5K2.1 may be based on harm resulting from relevant conduct, not just conduct comprising the offense of conviction. *United States v. Purchess*, 107 F.3d 1261, 1271 (7th Cir. 1997) (citing in part *United States v. Sanders*, 982 F.2d 4, 9-10 (1st Cir. 1992); *Kim*, 896 F.2d at 683-84; and *United States v. Shields*, 939 F.2d 780, 782-83 (9th Cir. 1991)).

If the court had not departed upward pursuant to §5K2.21, an upward departure under §5K2.1 would clearly be appropriate. Defendant knowingly risked J.H.'s death when he sold him heroin. *See United States v. Williams*, 51 F.3d 1004, 1012 (11th Cir. 1995) ("When determining whether a death 'resulted' from the offense for purposes of section 5K2.1, a factual finding 'that death was intentionally or knowingly risked is sufficient.'" (citing *United States v. White*, 979 F.2d 539, 545 (7th Cir. 1992) and *United States v. Rivalta*, 892 F.2d 223, 232 (2d Cir. 1989))), *abrogated on other grounds by Jones v. United States*, 526 U.S. 227, 231 (1999). Because the court has already departed upward pursuant to USSG §5K2.21 because of J.H.'s death, however, it may not depart upward further pursuant to USSG §5K2.1 for the same conduct. *See United States v. Pena*, 339 F.3d 715, 719 (8th Cir. 2003) (explaining that the advisory Sentencing Guidelines generally prohibit "double counting," that is, when "one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the guidelines" (citations and internal quotation marks omitted).

---

[19] The parties do not cite any Eighth Circuit Court of Appeals cases that discuss §5K2.1 departures, and the court finds none.

## VI.  VARIANCE

### A.  Downward Variance

Defendant's advisory Sentencing Guidelines sentence, after all applicable adjustments and departures, is 292 to 365 months' imprisonment.  In this post-*Booker* world, however, this sentence is merely advisory.  In other words, the departure issue is not the ultimate inquiry.

> Departures are based on specific sections of Chapter 5, Part K of the U.S. Sentencing Guidelines (USSG) Manual and USSG §4A1.3. Reasonableness of the ultimate sentence is based on the statutory elements contained in § 3553(a).  While the [issues of departures and variances] may sometimes overlap . . . district courts . . . would do well not to make post-*Booker* sentencing any more confusing than necessary by conflating the two distinct analyses.

*United States v. Zeigler*,  463 F.3d 814, 820 (8th Cir. 2006) (Hansen, S.J., concurring) (citations omitted).

The court turns to examine the § 3553(a) factors.  In pertinent part, § 3553(a) directs the court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . .

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Having considered all of these factors, the court finds that a downward variance and an ultimate sentence of 210 months' imprisonment is appropriate for Defendant.

The court need not explicitly set forth its analysis of all of the § 3553(a) factors here. The court's discussion of many of the factors militating in favor of a sentence near the middle- to upper-end of the statutory range of 60 to 480 months' imprisonment are already set forth in the court's discussion of Defendant's advisory Sentencing Guidelines range, including the court's discussion of the appropriateness of an upward departure. Put simply, this is not the typical heroin conspiracy case. In addition to participating in a conspiracy, Defendant also personally distributed heroin resulting in death during the charged conspiracy. J.H.'s death was reasonably foreseeable to Defendant; Defendant knowingly risked J.H.'s death when he sold him heroin; and Defendant was the proximate cause of J.H.'s death.

Although the court must take into account the advisory Sentencing Guidelines range, the emphasis the Sentencing Commission places on death is not dispositive. *United States v. Beal*, 463 F.3d 834, 835-36 (8th Cir. 2006). "The court may . . . impose a sentence outside of the range in order to 'tailor the sentence in light of other statutory concerns in

§ 3553(a).'" *Id.* at 836 (quoting *United States v. Claiborne*, 439 F.3d 479, 480 (8th Cir. 2006), *cert. granted*, 2006 WL 2187967, at *1 (U.S. Nov. 3, 2006). However, "[a]n extraordinary reduction must be supported by extraordinary circumstances." *Id.*; *see also id.* at 838 (reversing district court's decision to vary 104 months below the lowest end of the applicable Guidelines range because the "justifications given . . . [were not] compelling enough").

The court believes that Defendant's advisory Sentencing Guidelines range of 292 to 365 months' imprisonment, which is largely driven by the court's decision to depart upward from a range of 78 to 97 months' imprisonment pursuant to §5K2.21, does not adequately take into account Defendant's scienter or J.H.'s asthma condition. In some situations in which an upward departure pursuant to §5K2.21 is warranted, the defendant may have knowingly caused the death of the individual. It may have been the purpose of the defendant to kill. Or, in some instances, the defendant may have taken greater risks than Defendant. For example, the defendant may have knowingly distributed an unusually pure form of the drug to his customer.

Clearly, it was not Defendant's purpose or specific intent to cause J.H.'s death. Defendant wanted J.H.'s money, not his life. Moreover, J.H. did not die from a typical overdose. He died from a lethal combination of heroin use and his pre-existing asthma condition. Dr. Carson stated that both the heroin and the asthma caused J.H.'s death. Exhibit 3. There is no evidence that Defendant knew that J.H. had asthma or that heroin and asthma are a potentially lethal combination.

The court finds that a downward variance and an ultimate sentence of 210 months' imprisonment is appropriate for Defendant. A sentence below 210 months' imprisonment, however, would not adequately reflect the serious of Defendant's offense, promote respect for the law or provide just punishment. A sentence below 210 months' imprisonment

would also create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See, e.g., United States v. Lazenby*, 439 F.3d 928, 933-34 (8th Cir. 2006).

In light of all of the § 3553(a) factors, including those not specifically discussed in the instant Sentencing Memorandum, the court finds that a downward variance and an ultimate sentence of 210 months' imprisonment is appropriate for Defendant.

## B. Alternative Sentences

In the event that the court is mistaken about the propriety or extent of an upward departure pursuant to §5K2.21, and Defendant's advisory Sentencing Guidelines range should be somewhere between the 78 to 97 months' imprisonment range and less than 292 to 365 months' imprisonment, the court would nonetheless exercise its discretion under *Booker*, vary upward, if necessary, and impose a sentence of 210 months' imprisonment. The court so finds after considering the § 3553(a) factors.

## VII. CONCLUSION

The court found that **Defendant's base offense level under the advisory Sentencing Guidelines was 26**. USSG §2D1.1(a)(3) and (c)(7). It found he was not entitled to a §3E1.1 acceptance of responsibility reduction. Because Defendant was a **Criminal History Category III**, the court found that, **before departures, Defendant's advisory Sentencing Guidelines range was 78 to 97 months' imprisonment.** *See* USSG Sentencing Table. The court found Defendant's case to be outside the "heartland" and decided to depart upward twelve levels to a range of 292 to 365 months' imprisonment. The court decided a downward variance was appropriate, and, **after analyzing the factors at 18 U.S.C. § 3553(a), decided that a sentence of 210 months' imprisonment was a reasonable sentence.**

**IT IS SO ORDERED.**

**DATED** this 8th day of November, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA